1  DENNIS K. BURKE
   United States Attorney
   District of Arizona
2
3  ALISON S. BACHUS
   Assistant U.S. Attorney
   Two Renaissance Square
   40 N. Central Avenue, Suite 1200
4  Phoenix, Arizona 85004-4408
   Arizona State Bar No. 023884
   Telephone (602) 514-7500
5  Alison.Bachus@usdoj.gov

6

7                    UNITED STATES DISTRICT COURT

8                         DISTRICT OF ARIZONA

9  United States of America,                    CR-10-8050-001-PCT-NVW

10                  Plaintiff,
                                          **RESPONSE TO DEFENDANT CAPITO'S**
11        v.                                   **MOTION TO SUPPRESS**

12 Ronald Michael Capito,

13                  Defendant.

14        The United States hereby responds to Defendant Capito's Motion to Suppress (Dkt. 43)

15 and asks this Court to deny the Motion for the following reasons.

16 **I.    INTRODUCTION**

17        Defendant Ronald Michael Capito ("Defendant") moves this Court to suppress all

18 evidence in this case.  In an Order dated December 16, 2009, this Court ordered cell phone

19 providers to furnish to the government historical cellular tower log information for a specified

20 time period on the dates of particular bank robberies.  In so ordering under 18 U.S.C. § 2703(d),

21 the Court correctly held the government to a "relevant and material" standard.  Defendant now

22 argues that because the Court did not require a probable cause showing – which is not required

23 under the statutory scheme – that the tower log information, and any evidence derived therefrom,

24 should be suppressed.  Defendant is incorrect.  As courts across the United States have

25 repeatedly held, a warrant is not required for historical cell site location records.  Furthermore,

26 suppression is not the applicable remedy.  Finally, Defendant lacks standing to challenge the use

27 of the Order to obtain historical location information regarding anyone but himself.

28 Consequently, Defendant's Motion fails.

## II.    FACTS

Defendant is charged with committing eight armed bank robberies throughout Arizona with co-defendant Joel Glore ("Glore").  Defendant and Glore are also charged with an additional eight armed bank robberies in Utah, Colorado, and New Mexico.  Defendant and Glore are alleged to have committed these 16 bank robberies between September 8, 2009 and February 24, 2010.

During the initial investigation of these robberies, investigators linked the robberies together due to witness descriptions and a distinctive *modus operandi* used by the robbers.  The physical description of the robber was always the same, his language and mannerisms were very similar, he always brandished a handgun, and often the robber was seen fleeing the bank on the back of an ATV that was driven by another male.  The robbers were dubbed the "High Country Bandits," because they usually struck in the High Country of Arizona.

Before one of the robberies, a witness saw a man matching the robber's description, acting in a suspicious manner and talking on a cellular telephone.  Therefore, information regarding cellular telephone location became "relevant and material to the ongoing criminal investigation," 18 U.S.C. § 2703(d).  Concerned that multiple armed robberies were continuing to occur, the United States filed an Application with the Court for an Order directing six cellular service providers to furnish historical cell tower log information.  The United States filed its Application on December 16, 2009.

The Application was limited in the data requested: the United States requested that each provider furnish the phone numbers of telephones that registered at the tower that serviced a particular bank, for a specified time period, on a particular day.  The United States asked for this data for only four of the robberies: the September 8, 2009 robbery in Heber, Arizona; the November 25, 2009 robbery in Payson, Arizona; the December 3, 2009 robbery in Gold Canyon, Arizona; and the December 4, 2009 robbery in Pinetop, Arizona.  Those robberies were selected because they were in the four most rural locations that were robbed, resulting in a lack of overlap

2

1  in cell tower coverage, in order to minimize the amount of extraneous telephone data that would
2  likely be obtained.

3          United States Magistrate Judge David K. Duncan granted the United States' Application
4  and found that the records sought by the United States were "relevant and material to an ongoing
5  criminal investigation."  The Order was signed on December 16, 2009 and copies were provided
6  to the various service providers named in the Order.

7          On March 4, 2010, after having received the records from four of the service providers,
8  FBI Special Agent ("SA") Geoffrey Young created a table in a computer program that compared
9  the phone numbers that had registered off of the towers and looked for common numbers.  SA
10  Young learned that two phone numbers had registered off towers close to 3 of the 4 banks that
11  were robbed.  One of those phone numbers belonged to Defendant, and the other belonged to
12  Glore.  During the time of those three robberies, Defendant and Glore's phones had been in
13  contact with each other.

14          Investigators then began learning more about Defendant and Glore.  Investigators
15  discovered, among other things, that Defendant and Glore lived very close to each other in Show
16  Low and that they had been in contact with an Arizona Game and Fish Officer shortly before the
17  robbery in Heber.  There, they had been cited for riding double on an ATV, with Defendant
18  driving and Glore on the back (just as they would escape from the banks), and the ATV was
19  similar in appearance as the one used in the Heber robbery.  Investigators also learned that
20  Defendant had been arrested for assaulting Glore in Colorado and that Defendant and Glore
21  gambled at casinos in Colorado and elsewhere.

22          In addition, on March 3, 2010, the United States applied for, and obtained via a 18 U.S.C.
23  § 2703(d) order, historical cell site information for Defendant's and Glore's phones.
24  Investigators then compared the location of their phones to the locations of the 16 bank
25  robberies.  Based on their review of Defendant's cell phone records, investigators learned that
26  Defendant was in the vicinity, or traveled to or from the vicinity of all 16 banks that were robbed
27  by the High Country Bandits.

28
                                        3

1       Based on the above information, search warrants for Defendant, his residence and

2   vehicles, and for Glore, Glore's residence, and Glore's vehicle, were authorized on March 10,

3   2010.  In Defendant's home and vehicle, various pieces of evidence, including a stolen ATV

4   matching the description of one used in various robberies, a handgun that looked like the one

5   used in the December 3 robbery, clothing similar to that used in various robberies, and GPS

6   devices.  In Glore's home, investigators found a list of cities in which the High Country Bandits

7   had struck, newspaper articles about the High Country Bandits, and clothing worn by the robber

8   in some of the robberies.   Based on this evidence, a complaint and arrest warrants were

9   authorized for both Defendant and Glore.

10      Finally, both Defendant and Glore were interviewed by law enforcement.  Although

11  Defendant invoked his right to counsel, Glore elected to speak with investigators.  Glore told

12  investigators that he and Defendant were responsible for the 16 bank robberies and gave specific

13  details.

14      After his arrest on the criminal complaint, Defendant was ordered detained as both a

15  danger to the community and a flight risk.  Defendant and Glore were indicted by a grand jury

16  on March 24, 2010 on eight counts of Armed Bank Robbery.  On June 16, 2010, the grand jury

17  returned a Superseding Indictment, charging Defendant and Glore with Conspiracy (8 counts),

18  Armed Bank Robbery (8 counts), and Use of a Firearm During a Crime of Violence (2 counts).

19  Defendant and Glore have also been indicted in the Districts of Utah, Colorado, and New

20  Mexico for the eight other bank robberies.

21      On November 24, 2010, Defendant filed the instant Motion to Suppress, and this Court

22  ordered, after Defendant was appointed new counsel, that the United States' response be filed

23  by February 4, 2011.

24  **III.   ANALYSIS**

25      Defendant asserts that historical cell tower log information constitutes information from

26  a tracking device, and he argues that the evidence in this case should be suppressed because the

27  United States did not obtain a warrant for that tracking information.  Defendant is wrong on both

28                                                      4

counts.  As the case law states, historical data is not tracking device information, and a warrant is not required.  Furthermore, even if this Court were to somehow find a warrant was needed, suppression is not an appropriate remedy, and investigators had a good-faith basis to rely on this Court's lawful Order for the tower log information.

**A.  Overview of cellular technology and cell-site record creation and retention**

Cellular telephone companies keep, in the regular course of their business, records of certain information associated with their customers' calls. As reflected in the attached exemplar, the records include for each call that a customer made or received:  (1) the date and time of the call; (2) the telephone numbers involved; (3) the cell tower to which the customer connected at the beginning and/or end of the call; and (4) the duration of the call.   The records may also, but do not always, specify a particular sector of a cell tower used to transmit a call.[1]  No such record is created when the phone is not in use.

Although historical cell tower records provide limited information, that information is useful to law enforcement because it provides a general indication of where a cell phone call was made.  As one court has explained,

> [t]he information does not provide a "virtual map" of the user's location.  The information does not pinpoint a user's location within a building.  Instead, it only identifies a nearby cell tower and, for some carriers, a 120-degree face of that tower.  These towers can be up to 10 or more miles apart in rural areas and may be up to a half-mile or more apart even in urban areas.

*In re Application*, 405 F. Supp. 2d 435, 449 (S.D.N.Y. 2005) (*Gorenstein Opinion*) (citation omitted).[2]  Critically, no Global Positioning System ("GPS") data or other more precise location

---

[1]   Cell towers are often divided into three 120° sectors, with separate antennas for each of the three sectors. To the extent this information does exist in a particular instance, it does not provide precise information regarding the location of the cell phone at the time of the call, but instead only identifies  which of the three 120°, pie-slice sectors where the phone was probably located.

[2]  In order to reduce confusion, citations in this memorandum to district court opinions involving government applications under § 2703(d) (typically captioned "In re Application ... ", etc.) will identify the case by the name of the authoring judge.

5

1   information (such as "triangulation" data) is contained in the historical records obtained by the
2   government in this case.

### B. The government obtained cell-site information lawfully in this case, and in any event the evidence is not subject to suppression under any statutory theory

5   In his brief, Defendant claims the government improperly obtained historical cell-site
6   location information from his wireless provider using a court order issued under 18 U.S.C.
7   § 2703(d).  Defendant further asserts that the government was required to obtain a warrant, and
8   that its failure to do so entitles him to suppression of the disputed records.

9   Neither claim withstands scrutiny.  As set forth below, § 2703(d) is the proper and lawful
10  means of compelling such third-party records.  Moreover, no relevant statutory suppression
11  remedy exists, with the result that no court has ever ordered the suppression of historical cell-site
12  records.  On the contrary, numerous courts have denied such motions and emphatically rejected
13  the arguments put forward by Defendant.

### 1. The government properly obtained records concerning Defendant's phone using a court order under 18 U.S.C. § 2703(d)

16  The first issue is whether the government may obtain historical cell-site information under
17  the Stored Communications Act (SCA).  "A court's starting point to determine the intent of
18  Congress is the language of the statute itself." *United States v. Ranum,* 96 F.3d 1020, 1029 (7th
19  Cir. 1996).  "If that language is "clear and unambiguous the court must give effect to the plain
20  meaning of the statute." *Id.* (citations omitted). Title 18, United States Code, § 2703
21  unambiguously states that the government may require "a provider of electronic communication
22  service" to disclose "a record or other information pertaining to a subscriber to or customer of
23  such service (not including the contents of communications)" pursuant to a 2703(d) order. *See*
24  18 U.S.C. § 2703(c)(1). As explained below, cell-site information satisfies each of the three
25  elements necessary to fall within the scope of this provision.

26  First, a cell phone company is a provider of electronic communication service.
27  "Electronic communication service" is defined to mean "any service which provides to users

thereof the ability to send or receive wire or electronic communications." 18 U.S.C. §§ 2510(15) and 2711(1). Cell phone service providers provide their customers with the ability to send wire communications, and thus they are providers of electronic communication service. *See* 18 U.S.C. § 2510(1) (defining wire communications).

Second, cell-site information constitutes "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)." Historical cell-site information is a record stored by the provider concerning the particular cell tower used by a subscriber to make a particular cell phone call, and it is therefore "a record or other information pertaining to a subscriber to or customer of such service." *See In re Application*, 620 F.3d 304, 307-08 (3d Cir. 2010) ("there is no dispute that historical CSLI [cell-site location information] is a 'record or other information pertaining to a subscriber ... or customer'"); *Gorenstein Opinion*, 405 F. Supp.2d 435, 444 (S.D.N.Y. 2005) (noting that prospective cell-site data is "information" and "'pertain[s]' to a subscriber to or customer of cellular telephone service").

Third, cell-site information is non-content information, as it does not provide the content of any phone conversation the user has over the cell phone. *See* 18 U.S.C. § 2510(8) (defining the "contents" of a communication to include information concerning its "substance, purport, or meaning").

Thus, because historical cell-site information satisfies each of the three elements of § 2703(c)(1), its disclosure may be compelled pursuant to § 2703(d) order. The overwhelming majority of courts to consider this issue have come to the same conclusion. Specifically, judges have endorsed the use of a § 2703(d) order to obtain historical cell-site information in all of the following opinions[3]:

---

[3] The United States notes that the Third Circuit is the only federal appellate court to rule on this issue, and no federal court has addressed the issue of cell tower log information like that found in this case. However, the case law regarding historical cell site information under § 2703(d) applies to this Court's analysis because the Order Defendant challenges is a § 2703(d)

(continued...)

7

1    • *In re Application*, 620 F.3d 304, 313 (3d Cir. 2010) ("In sum, we hold that CSLI from

2    cell phone calls is obtainable under a § 2703(d) order and that such an order does not

3    require the traditional probable cause determination.")

4    • *In re Application*, 509 F. Supp. 2d 76 (D. Mass. 2007) (*Stearns Opinion*), *rev'g* 509 F.

5    Supp. 2d 64 (D. Mass. 2007) (*Alexander I Opinion*)

6    • *In re Application,* 2007 WL 3036849 at *5 (S.D. Tex. Oct. 17, 2007) (*Rosenthal Opinion*)

7    • *United States v. Jenious*, No. 09-Cr-097 (E.D. Wis. Aug. 28, 2009) (unpublished)

8    • *In re Application,* 396 F. Supp. 2d 747, 748 (S.D. Tex. 2005) (*Smith I Opinion*)

9    • *In re Applications*, 530 F. Supp. 2d 367 (D. Mass. 2007) (*Alexander II Opinion*)

10   • *United States v. Arthur*, 2007 WL 2002500 (E.D. Mo. July 5, 2007)

11   • *United States v. Suarez-Blanca*, 2008 WL 4200156 (N.D. Ga. Mar. 26, 2008)

12   • *In re Application,* 415 F. Supp. 2d 211, 214 (W.D.N.Y. 2006) (*Feldman Opinion*) (in

13   dicta)

14   • *In re Application,* 396 F. Supp. 2d 294, 313 (E.D.N.Y. 2005) (*Orenstein I Opinion*) (in

15   dicta)

16   • *In re Application,* 2006 WL 6217584 at *2 n.3 (D.D.C. Aug. 25, 2006) (*Hogan Opinion*)

17   (in dicta)

18   • *Mitchell v. State*, 25 So. 3d 632 (Fla. Dist. Ct. App. 2009) (approving use of order issued

19   under state law identical to §2703(d))

20   Of particular note in the list above is the first one, *In re Application*, 620 F.3d 304 (3d Cir.

21   2010), which is the only federal appellate decision on the topic.  In that case, the Third Circuit

22   vacated a magistrate judge's decision *(In re Application,* 534 F. Supp. 2d 585 (W.D. Pa. 2008)

23   (*Lenihan Opinion*)) to require a search warrant for historical cell-site information.  Defendant

24   cites extensively to the vacated opinion in support of his Motion to Suppress.  However, the

26   [3] (...continued)

27   order.  Thus, the United States provides this list of out-of-district cases dealing with § 2703(d)
     orders.

28                                          8

Third Circuit, as quoted above, soundly rejected the notion that a warrant is required.  The court held that a judge <u>could</u> require one, due to the statutory language, but it expressly stated a warrant is <u>not</u> required.  Defendant argues that because the Third Circuit said a warrant could be required, then it must be required.  The Third Circuit did not so hold; indeed, it signaled its reluctance to hold a warrant could be required when it stated it was allowing the warrant to remain as an "option" for the magistrate judge – "although it is an option to be used sparingly because Congress also included the option of a § 2703(d) order."  *In re Application*, 620 F.3d at 319.  Thus, neither of Defendant's bases for his Motion to Suppress survive muster by the very authority he cites.

To be sure, only a handful of courts has rejected using a § 2703(d) order to obtain historical cell-site information. Of those, three decisions were promptly reversed in the district court. *See In re Application*, 2010 WL 3463132 (E.D.N.Y. Aug. 27, 2010) (*Orenstein II Opinion*), *rev'd by the District Court*;[4] *Alexander I Opinion*, 509 F. Supp. 2d 64 (D. Mass. 2007), *rev'd by Stearns Opinion*, 509 F. Supp. 2d 76 (D. Mass. 2007); *Rosenthal Opinion*, 2007 WL 3036849 at *5 (S.D. Tex. Oct. 17, 2007) (reversing magistrate judge's denial). And the most prominent of the adverse decisions, *In re Application,* 534 F. Supp. 2d 585 (W.D. Pa. 2008) (*Lenihan Opinion*), which is heavily relied upon by Defendant in support of the instant Motion, was vacated by the Third Circuit decision cited above.

Thus, the government's use of a § 2703(d) order here was wholly proper.  As discussed in Section II, *supra*, the United States provided the Court with specific and articulable facts in its Application for the historical cell tower log information.  In the Application, the United States detailed the four subject armed bank robberies that took place on September 8, November 25, December 3, and December 4, 2009 in outlying areas of Arizona.  Those robberies were selected, out of the nine armed robberies they had committed to that point, due to their rural locations;

---

[4]  On November 29, 2010, District Court Judge Roslynn R. Mauskopf entered an order reversing the magistrate judge and granting the government's application under § 2703(d). *See* Docket for 1:10-mc-00550-RRM-JO (E.D.N.Y.).  A written opinion is expected to follow.

thus, investigators were limited in what they requested.  The information in support of the Application included the similar *modus operandi* of the robbers, including weapon, language, and method of flight from the bank (in the last two robberies).  Witnesses who were near the November 25 bank noticed a man, matching the robber's description, acting suspiciously in the 2-3 hours leading up the robbery.  The man was seen talking on a cellular telephone during the time he was in the area of the bank.

Because the robber was seen on a cellular telephone before he committed one of the subject robberies, cellular telephone data became relevant and material to investigators under § 2703(d).  Accordingly, the United States applied for the historical cell tower log information, and the Court granted the Application based on those specific and articulable facts.

### 2.   The Stored Communications Act provides no statutory suppression remedy

More importantly, even if the government's use of § 2703(d) in this case were improper, suppression is not available as a remedy. None of the cases cited by Defendant – including the now-vacated *Lenihan Opinion* – granted suppression or supports such a remedy, and no such remedy is available. *See* 18 U.S.C. § 2708 ("The [damages] remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter.").

To the contrary, the Ninth Circuit and other courts have unanimously held that no such statutory suppression remedy exists under the SCA. *See United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) ("the Stored Communications Act expressly rules out exclusion as a remedy"); *United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003); *United States v. Christie*, 2009 WL 742720 at *3 (D.N.J. Mar. 18, 2009); *United States v. Wellman*, 2009 WL 37184 at *8 n.2 (S.D. W. Va. Jan. 7, 2009); *United States v. Qing Li*, 2008 WL 789899 at *3 (S.D. Cal. Mar. 20, 2008); *United States v. Beckett*, 544 F. Supp. 2d 1346, 1350 (S.D Fla. 2008); *United States v. Ferguson*, 508 F. Supp. 2d 7, 10 (D.D.C. 2007); *Bansal v. Russ*, 513 F. Supp. 2d 264, 282-83 (E.D. Pa. 2007); *United States v. Sherr*, 400 F. Supp. 2d 843, 848 (D. Md. 2005); *United States v. Kennedy*, 81

F. Supp. 2d 1103, 1110 (D. Kan. 2000) ("[S]uppression is not a remedy contemplated under the ECPA."); *United States v. Hambrick,* 55 F. Supp. 2d 504, 507 (W.D. Va. 1999) ("Congress did not provide for suppression where a party obtains stored data or transactional records in violation of the Act."), *aff'd,* 225 F.3d 656, 2000 WL 1062039 (4th Cir. 2000); *United States v. Reyes*, 922 F. Supp. 818, 838 (S.D.N.Y. 1996) ("Exclusion of the evidence is not an available remedy for this violation of the ECPA."). Courts have applied this general principle in the specific context of historical cell-site records. *See Suarez-Blanca*, 2008 WL 4200156 at *4 (holding that suppression is not a remedy for asserted violations of the SCA, and rejecting a defense motion to exclude historical cell-site location information).

> 3. <u>Even if a user's own phone were a "tracking device," a warrant is not required and no statutory suppression remedy exists</u>

Defendant argues that cellular phones are "tracking devices" as defined in 18 U.S.C. § 3117, and that the records at issue in this case – obtained in conformity with 18 U.S.C. § 2703(d) – must be suppressed. This argument contains two separate premises: a) that a cell phone is a tracking device; and b) that a tracking device may not be used absent a warrant under the tracking device provisions of Rule 41. As explained below, each of these premises is incorrect.

First, the language and structure of 18 U.S.C. § 3117 makes clear that a "tracking device" is a homing device secretly installed by the government. Specifically, 18 U.S.C. § 3117(a) applies only when a court is authorized to issue an order "for the installation of a mobile tracking device." In the case of a wireless phone knowingly possessed by its user, no such installation occurs, and such a phone is therefore not a tracking device within the narrow meaning of the statute. *See, e.g., Stearns Opinion*, 509 F. Supp. 2d 76, 81 n.11 (D. Mass. 2007); *In re Application,* 460 F. Supp. 2d 448, 461 (S.D.N.Y. 2006) (*Kaplan Opinion*) ("Here, the government does not seek to *install* any sort of tracking device") (emphasis in original); *In re Application*, 411 F. Supp. 2d 678, 681 (W.D. La. 2006) (*Hornsby Opinion*) ("The existence of a true 'tracking device' is unknown to, and cannot be disabled or turned off by, the person being

11

tracked."); *Gorenstein Opinion*, 405 F. Supp. 2d 435, 449 n.8 (S.D.N.Y. 2005) (§ 3117 "contemplates the 'installation' of a tracking device, which has not been sought here"); *see also In re Application*, 620 F.3d 304, 313 (3d Cir. 2010) ("We therefore cannot accept the [magistrate judge's] conclusion that CSLI by definition should be considered information from a tracking device ....").

This reading, based on the text of the statute, is bolstered by the historical origins of § 3117, enacted in 1986 as part of ECPA.  Most obviously, the 1986 House Report discusses only conventional, surreptitiously installed "beeper" homing devices[5] of the type at issue in the two then-recent landmark Supreme Court decisions *United States v. Knotts*, 460 U.S. 276 (1983) (beeper installed in can of chloroform and used to track movements of car) and *United States v. Karo*, 468 U.S. 705 (1984) (beeper installed in can of ether expected to be used in production of cocaine). Although ECPA's legislative history deals extensively with cellular telephones in other areas, the discussion of tracking devices conspicuously omits any mention of them.

Moreover, under Defendant's proposed reading of "tracking device," nearly all communications devices would be tracking devices. The same is also true of banking ATMs, retail credit-card terminals, or even landline telephones (since it is possible to determine information about a person's location from his use of each).  Treating all such devices as "tracking devices" grossly distorts § 3117's scope and purpose, as a recent opinion from the Eastern District of California emphasizes:

> No use of cell phones and cell towers for tracking was expressly contemplated, and perhaps was not even possible in 1986. Certainly the legislative history gives no such indication.
>
> In addition, it would prove far too much to find that Congress contemplated legislating about cell phones as tracking devices. For example, if an agent presently used a cell phone to communicate the whereabouts of a suspect by using the phone's video feature while he was surveilling the suspect, one could fit this situation into the words of the statute-one was using an electronic device which "permitted" the tracking of the suspect. Or, take the example of the ubiquitous monitoring cameras, such as the "red light," parking lot or freeway cameras. These cameras track the location of many persons, albeit in a confined location, and

---

[5]   *See* H.R. Rep. No. 467, 99th Cong., 2d Sess. at 60 (1986).

1    could also fit in with the words of the statute. It is best to take the cue from
2    Congress in this respect of electronic tracking devices, and confine § 3117(b) to
the transponder type devices placed upon the object or person to be tracked.

3    *In re Application,* 2007 WL 397129 at *2 (E.D. Cal. Feb. 1, 2007) (*Hollows Opinion*).

4        Second, even if a cell phone were treated as a tracking device, it does not follow that

5    court authorization is necessary. *United States v. Knotts*, 460 U.S. 276 (1983), makes

6    abundantly clear that tracking may be done in many circumstances with no court approval (prior

7    or otherwise). *See also United States v. Pineda-Moreno*, 591 F.3d 1212, 1215-16 (9th Cir. 2010)

8    (no warrant required for installation and use of tracking device); *United States v. Marquez*, 605

9    F.3d 604, 609-10 (8th Cir. 2010) (same); *United States v. Garcia,* 474 F.3d 994 (7th Cir. 2007)

10   (same); *United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999) (same).

11        Nor does § 3117 impose any requirement that a court order be obtained. *See, e.g., United*

12   *States v. Gbemisola*, 225 F.3d 753, 758 (D.C. Cir. 2000) ("But by contrast to statutes governing

13   other kinds of electronic surveillance devices, § 3117 does not *prohibit* the use of a tracking

14   device in the absence of conformity with the section.") (Emphasis in original). No court has ever

15   ordered suppression of cell-site information on this (or any other) theory, and two have expressly

16   rejected it even as to government acquisition of real-time (non-historical) cell-site information.

17   *See United States v. Forest*, 355 F.3d 942, 950 (6th Cir. 2004) (prospective cell-site information;

18   no suppression remedy under § 3117); *United States v. Flores*, 2007 WL 2904109 at *4 & n.1

19   (N.D. Ga. Sept. 27, 2007) (prospective cell-site information; no suppression remedy under §

20   3117). The same is true of Rule 41: as the Advisory Committee Notes to the 2006 amendments

21   explain, if "officers intend to install and use the [tracking] device without implicating any Fourth

22   Amendment rights, there is no need to obtain the warrant." Fed. R. Crim. P. 41, Advisory Comm.

23   Notes to 2006 Amendments, subdivision (b).

24        Indeed, even among the courts that have found cell phones to be tracking devices within

25   the meaning of § 3117 (and denied requests for <u>prospective</u> cell-site information), at least three

26   have explicitly declared that <u>historical</u> cell-site records may be obtained under the lower

27   "specific and articulable facts" standard of § 2703(d). *See Feldman Opinion*, 415 F. Supp. 2d

28                                            13

211, 214 (W.D.N.Y. 2006); *Orenstein I Opinion*, 396 F. Supp. 2d 294, 321 (E.D.N.Y. 2005); *Smith I Opinion*, 396 F. Supp. 2d 747, 757 (S.D. Tex. 2005).

As a result, Defendant's motion to suppress should be denied.

**C.   Defendant is not entitled to suppression under the Fourth Amendment**

Finally, Defendant suggests that a user has a reasonable expectation of privacy in historical cell-site information, and that his Fourth Amendment rights were violated. This conclusion is incorrect for multiple reasons. First, under the established principles of *United States v. Miller*, 425 U.S. 435 (1976), and *Smith v. Maryland*, 442 U.S. 735 (1979), there is no reasonable expectation of privacy in such information, and, accordingly, no Fourth Amendment-protected privacy interest. Second, historical cell-site information is far too imprecise by any measure to intrude upon a reasonable expectation of privacy. In addition, Defendant lacks standing to challenge the government's acquisition of cell-site records concerning other users' phones. Finally, suppression may not be granted where investigators reasonably relied in good faith upon a statute, even if a court later finds that law unconstitutional. Thus, Defendant's claim of entitlement to constitutional suppression also fails.

1.   Defendant does not have standing to seek suppression of records pertaining to co-defendant's phone

In the instant case, Defendant cannot move to suppress the records obtained regarding co-defendant Glore's cellular telephone. It is well settled that to establish standing for a Fourth Amendment challenge, a plaintiff must demonstrate that the government violated his own reasonable expectation of privacy. *See Rakas v. Illinois,* 439 U.S. 128, 143 (1978). As the Supreme Court stated in *Rakas*, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134.

Under this principle, a defendant lacks standing to challenge the government's acquisition of location information about a phone used by another person. *See United States v. Forest*, 355

F.3d 942, 948 (6th Cir. 2004) ("Because Forest does not claim any legitimate expectation of privacy in the cell-site data from Garner's cellular phone, he lacks standing"), *vacated on other grounds*, 543 U.S. 1100 (2005); *United States v. Jenious*, No. 09-Cr-097 at *6 (E.D. Wis. Aug. 28, 2009) (unpublished) (defendant lacked standing to seek suppression of historical cell-site records concerning co-defendant's phone); *United States v. Bermudez,* 2006 WL 3197181 at *13 (S.D. Ind. June 30, 2006), *aff'd* 509 F.3d 820 (7th Cir. 2007) (defendant who did not possess or use co-defendant's wireless phone "cannot suppress the evidence gained from the government's tracking of [a third party's] phone"); *cf. United States v. Meriwether,* 917 F.2d 955, 959 (6th Cir. 1990) (holding that a defendant lacked a reasonable expectation of privacy in a message – his phone number – obtained from another party's electronic pager).

In this case, the government used a 2703(d) order to compel a cell phone company to produce business records pertaining to other persons' cell phone accounts, including Glore. Here, Defendant has no reasonable expectation of privacy in Glore's cell phone account, so he cannot challenge the production of records from Glore's account or anyone else other than himself.  To that extent, his motion to suppress must be denied.

In addition, it is important to note that the presence of Glore's cell phone in the area of the robberies was discovered at the same time that Defendant's was through the initial cell tower log information analysis.  Investigators quickly saw that both Defendant and Glore were in the area of those robberies, and that they were on the phone with each other in the time period of the robberies.  Therefore, even if investigators had not received information about Defendant's cell phone in that initial analysis, they would have identified Defendant because of his telephonic contact with Glore during the time of the robberies.  That contact is what, in turn, led to the identification of Defendant and Glore as suspects, the development of other evidence as described *supra*, and resulted in warrants being approved and executed and their subsequent arrests.

//

2.   <u>A subscriber has no expectation of privacy in historical cell-site records held</u>
<u>as routine business records by a third party</u>

The historical cell-site data that the government obtained via court order in this investigation was not in the hands of the cell phone user at all, but rather in the business records of a third party – the cell phone company.  The Supreme Court has held that a customer has no privacy interest in business records of this kind.[6]  Addressing a Fourth Amendment challenge to a third party subpoena for bank records, the Court held in *United States v. Miller*, 425 U.S. 435 (1976), that the bank's records "are not respondent's 'private papers'" but are "the business records of the banks" in which a customer "can assert neither ownership nor possession."  *Miller*, 425 U.S. at 440; *see also SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743 (1984) ("when a person communicates information to a third party ... he cannot object if the third party conveys that information or records thereof to law enforcement authorities").  Thus, an individual has no Fourth Amendment-protected privacy interest in business records, such as cell-site usage information, that are kept, maintained and used by a cell phone company in the normal course of business.  If anything, the privacy interest in cell-site information is even less than the privacy interest in a dialed phone number or bank records.  The location and identity of the cell phone tower handling a customer's call is generated internally by the phone company and is not, therefore,  typically known by the customer.  A customer's Fourth Amendment rights are not violated when the phone company reveals to the government its own records that were never in the possession of the customer.

Further, even if it were the case that cell-site information is disclosed by the subscriber to the telephone company, the Supreme Court's reasoning in *Smith v. Maryland* leads to the same result.  In *Smith*, the Court held both that telephone users have no subjective expectation of privacy in dialed telephone numbers and also that any such expectation is not one that society is prepared to recognize as reasonable.  *See Smith*, 442 U.S. at 742-44.  The Court's reasoning

---

[6]   Thus, but for 18 U.S.C. § 2703(d), the records at issue in this case could be compelled via subpoena.

16

applies equally to cell-site information.  First, the Court stated: "we doubt that people in general entertain any actual expectation of privacy in the numbers they dial.  All telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed."  *Id.* at 742.  Similarly, cell phone users understand that they must send a radio signal, which is received by a cell phone company's antenna in order to route their call to its intended recipient.  (Indeed, cell phone users are intimately familiar with the relationship between call quality and radio signal strength, as typically indicated by a series of bars on their phones' displays.)

Second, under the reasoning of *Smith*, any subjective expectation of privacy in cell-site information is unreasonable.  In *Smith*, the Court explicitly held that "even if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not one that society is prepared to recognize as reasonable."  *Id.* at 743 (internal quotation omitted).  It noted that "[t]his Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  *Id.* at 743-44.  In *Smith*, the user "voluntarily conveyed numerical information to the telephone company" and thereby "assumed the risk that the company would reveal to the police the numbers he dialed."  *Id.* at 744.  When a cell phone user transmits a signal to a cell tower for his call to be connected, he thereby assumes the risk that the cell phone provider will create its own internal record of which of its towers handles the call.  Thus, it makes no difference if some users have never thought about how their cell phones work; a cell phone user can have no expectation of privacy in cell-site information.

Numerous courts have held these constitutional principles directly applicable to cell-site location records.  *See United States v. Velasquez*, 2010 WL 4286276 at *5 (N.D. Cal. Oct. 22, 2010) (denying suppression); *United States v. Benford*, 2010 WL 1266507 at *3 (N.D. Ind. Mar. 26, 2010) (denying suppression); *United States v. Suarez-Blanca*, 2008 WL 4200156 at *23 (N.D. Ga. Mar. 26, 2008) (denying suppression); *Gorenstein Opinion*, 405 F. Supp. 2d 435, 449-50 (S.D.N.Y. 2005); *State v. Marinello*, 2010 WL 3893758 (La. App. Oct. 6, 2010) (denying

17

suppression); *Mitchell v. State*, 25 So. 3d 632 (Fla. Dist. Ct. App. 2009) (denying suppression). This court should likewise deny Defendant's invitation to find a constitutional privacy interest where none exists.

        3.   <u>Even if analyzed under the Supreme Court's cases concerning "tracking devices," government access to historical cell-site records is not a "search" and thus does not infringe any Fourth Amendment interest</u>

As a business record in the possession of a third party, cell-site information should not be judged under Fourth Amendment standards applicable to tracking devices surreptitiously installed by the government. However, even measured against the constitutional standards articulated by the Supreme Court in this area, there is no reasonable expectation of privacy in cell-site information.

Defendant argues that *United States v. Karo,* 468 U.S. 705 (1984) and *Kyllo v. United States,* 533 U.S. 27 (2001) entitles him to suppression. In so doing, Defendant goes so far as to suggest that the government is "essentially searching that person's property while it is in his pocket – a constitutionally protected area." Mot. at 17. As explained below, this claim both misreads this precedent and overstates the accuracy of cell-site information, and the motion to suppress should be denied.

Contrary to Defendant's argument, cell-site information provides only limited information about the location of a cell phone when a call is made. As one court has explained,

> [t]he information does not provide a "virtual map" of the user's location. The information does not pinpoint a user's location within a building. Instead, it only identifies a nearby cell tower and, for some carriers, a 120-degree face of that tower. These towers can be up to 10 or more miles apart in rural areas and may be up to a half-mile or more apart even in urban areas.

*Gorenstein Opinion,* 405 F. Supp. 2d 435, 449 (S.D.N.Y. 2005). Contrary to what Defendant would like the court to believe, no precision location information, including GPS information, is contained in the historical records provided to the government here.

The United States has attached, as Exhibit A, a sample of the information obtained in response to the § 2703(d) order in this case. As noted earlier, the records for each call include: (1) the date and time of the call; (2) the telephone numbers involved; (3) the cell tower to which

18

1    the customer connected at the beginning and/or of the call; and (4) the duration of the call. The

2    records may also, but do not always, specify a particular sector of a cell tower used to transmit

3    a call.  No record is created absent a communication.

4         Based on the cell-site information, the government is able to determine a broad

5    geographic swath in which a cellular telephone is at the beginning or end of a call.  The area in

6    which the telephone is located is determined in miles, and is not so precise that it pinpoints

7    someone's exact location, such as a particular building or even a particular street block.

8         Given that cell-site information is not precise, Defendant is wrong that any constitutional

9    privacy interest is at stake. In *Karo,* agents secretly installed a radio beeper in a can of chemicals,

10   and then tracked the can to various locations, including five separate residences and two multi-

11   unit storage facilities. Where the tracking system enabled the government to locate the can of

12   ether in a particular residence, the Supreme Court found that the Fourth Amendment had been

13   infringed. 468 U.S. at 715. Conversely, the Court found no Fourth Amendment violation when

14   the beeper was tracked to one of the storage facilities, but could not be tracked to the defendant's

15   particular storage locker within the facility. *Id.* at 721, n.6. Because monitoring of the beeper

16   could not be tracked to a particular locker and thus, revealed nothing about the inside of the

17   defendant's locker, the Court held that monitoring did not result in a "search" of the locker. *Id.*

18   at 721. As a result, the Court found no Fourth Amendment violation.

19        In sum, the test enunciated in *Karo* is not whether a tracked object is merely inside a

20   constitutionally-protected private space. Rather, *Karo* holds that government use of a tracking

21   device is a Fourth Amendment "search" only where the monitoring reveals the particular private

22   location in which the tracked object may be found. Cell-site information, which is precise at its

23   best only to within hundreds of yards, but more often in miles, cannot disclose that a user's

24   phone is inside a specific house or other constitutionally protected area.

25        Numerous courts addressing this issue with respect to prospective cell-site information

26   have reached the same conclusion – that cell site information is not precise. In the words of one

27   recent decision, "CSLI is less accurate than information obtained by GPS tracking technology

28                                        19

1    .... Nor is there any indication in the record that CSLI is capable of distinguishing movements

2    within a discrete space such as a residence." *Velasquez*, 2010 WL 4286276 at *5; *see also In re*

3    *Application,* 2008 WL 5082506 at *5 (E.D.N.Y. Nov. 26, 2008) (*Garaufis Opinion*) (cell-site

4    information, "unlike the information revealed by triangulation or ... Global Positioning System

5    devices, is not precise enough to enable tracking of a telephone's movements within a home");

6    *In re Application,* 497 F. Supp. 2d 301, 311-12 (D.P.R. 2007) (*McGiverin Opinion*); *Hornsby*

7    *Opinion,* 411 F. Supp. 2d 678, 682 (W.D. La. 2006) ("[C]ell-site information ... does not permit

8    detailed tracking of a cell phone user within any residence or building. Indeed, the Government

9    will not be able to pinpoint which room, house or building (if any) the user is in."); *Gorenstein*

10   *Opinion,* 405 F. Supp. 2d 435, 449 (S.D.N.Y. 2005).

11          For this reason, courts have held that the Fourth Amendment is not implicated when the

12   government obtains cell-site location information, and denied suppression motions as a result.

13   *See Velasquez*, 2010 WL 4286276 at *5; *United States v. Suarez-Blanca,* 2008 WL 4200156

14   (N.D. Ga. Mar. 26, 2008) (relating to historical cell-site information); *United States v. Flores*,

15   2007 WL 2904109 (N.D. Ga. Sept. 27, 2007) (relating to prospective cell-site information);

16   *Mitchell v. State*, 25 So. 3d 632 (Fla. Dist. Ct. App. 2009)  (historical cell-site information).

17   Thus, unless Defendant claims that he enjoys a constitutional expectation of privacy in the entire

18   miles-wide areas of certain cell towers, his claim under *Karo* fails.

19          Defendant also invokes *Kyllo v. United States*, 553 U.S. 27 (2001), as a basis for

20   suppressing the records at issue in this proceeding.  *Kyllo* provides no relief to Defendant,

21   however. In that case, the Supreme Court held that the use of thermal imaging equipment to

22   gather information about the interior of a home constituted an unlawful search. In particular, the

23   Court held that when the "Government uses a device that is not in general public use, to explore

24   details of the home that would previously have been unknowable without physical intrusion, the

25   surveillance is a 'search.'" *Kyllo*, 553 U.S. at 40.  *Kyllo* is not applicable to this case for two

26   reasons. First, the government did not use a device of any kind in this case – it simply compelled

27   the cell phone company to disclose business records in its possession. Nothing in *Kyllo* prevents

28                                                    20

the government from obtaining evidence from a third party. In fact, Defendant's overly broad interpretation of *Kyllo* would implicitly overrule *Smith v. Maryland*, 442 U.S. 734, 743-44 (1979), in which the Supreme Court held that use of a pen register device to monitor telephone numbers dialed from within a home did not violate the Fourth Amendment. Second, cell-site information does not – indeed, due to the inherent limits to its precision, cannot – reveal anything about the interior of a home or other constitutionally protected area. Thus, *Kyllo* is simply inapplicable, and Defendant's motion should be denied.

4. <u>The investigators' good-faith reliance upon a federal statutory authorization – 18 U.S.C. § 2703(d) – precludes suppression of the evidence</u>

Even if this Court were to conclude – contrary to the weight of authority cited above – that the Fourth Amendment protects the third-party historical records at issue in this case, Defendant would still not be entitled to the extraordinary remedy of suppression. Thus, "[t]he fact that a Fourth Amendment violation occurred ... does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 129 S. Ct. 695, 700 (2009). On the contrary, exclusion of evidence is appropriate only where it would have a substantial deterrent effect, and even then only when weighed against the heavy cost to society and the truth-seeking function. *Id*.

In particular, the Supreme Court has ruled squarely that an officer's reasonable reliance on a statute – even where a court concludes in hindsight that the statute is constitutionally infirm – bars application of the exclusionary rule. In *Illinois v. Krull*, 480 U.S. 340 (1987), the Supreme Court held that "[p]enalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 350. Such reliance on a duly enacted statute is unreasonable "if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws." *Id*. at 355. Absent the patent unconstitutionality of such a statute, an officer's good-faith reliance on it may not be penalized through suppression of evidence.

The agents in this case relied upon just such a statute, 18 U.S.C. § 2703(d).  As detailed in Section III.A.1 *supra*, not only did investigators here comply with this Congressional enactment, but the overwhelming weight of judicial authority holds that a) the statute may be used to compel historical cell-site records possessed by a third-party provider and b) such compulsion in no way intrudes upon a Fourth Amendment interest.  Under these circumstances, the investigators' reliance on the statute in this case was anything but unreasonable, and therefore falls squarely within the rule articulated in *Krull*.  As another court has held expressly,

> it was objectively reasonable for law enforcement to rely on [§ 2703(d)] to obtain historical cell site information because some case law suggests that [§ 2703(d)] applies to the historical cell site information and there was not much case law that questioned the constitutionality of [§ 2703(d)] for historical cell site information at the time that the government sought approval for obtaining the historical cell site information.

*Suarez-Blanca*, 2008 WL 4200156 at *12 (N.D. Ga. Apr. 21, 2008) (denying suppression).

Accordingly, even if this Court were to disagree with the many courts that have found § 2703(d) a proper means of compelling historical cell-site records, it would be improper to grant the remedy of suppression sought by Defendant.

## IV.   CONCLUSION

For all of the foregoing reasons, the United States requests that the Court deny Defendant's Motion to Suppress.

Respectfully submitted this 4th day of February, 2011.

DENNIS K. BURKE
United States Attorney
District of Arizona

_____
/s/
ALISON S. BACHUS
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:
Mark Berardoni, counsel for Mr. Capito

22

**Exhibit A**

**Sample of historical cell tower log information
(page 1 from Verizon's records for 9/8/09)**

United States' Response to Motion to Suppress

U.S. v. Ronald Michael Capito
CR 10-8050-001-PCT-NVW

|   | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Element Name | MDN | Dialed Digit Number | Dir | Seizure Dt Tm | Szr Dur | FS Cell Site | FS Cell Face | LS Cell Site | LS Cell Face |
| 2 | Phoenix1 | 9282400413 | 9282400413 | 6 | 9/8/2009 12:00 | 20 | 209 | 2 | 209 | 2 |
| 3 | Phoenix1 | 9282401375 | 9285376977 | 3 | 9/8/2009 12:00 | 14 | 209 | 2 | 209 | 2 |
| 4 | Phoenix1 | 9282400344 | 9282400344 | 6 | 9/8/2009 12:00 | 271 | 209 | 2 | 209 | 2 |
| 5 | Phoenix1 | 9282400879 | 9282400078 | 3 | 9/8/2009 12:00 | 38 | 209 | 2 | 209 | 2 |
| 6 | Phoenix1 | 9289782884 | 411 | 3 | 9/8/2009 12:00 | 46 | 209 | 2 | 209 | 2 |
| 7 | Phoenix1 | 6232107374 | 6023588822 | 3 | 9/8/2009 12:00 | 40 | 209 | 2 | 209 | 2 |
| 8 | Phoenix1 | 9282400143 | 4748901 | 3 | 9/8/2009 12:00 | 133 | 209 | 2 | 209 | 2 |
| 9 | Phoenix1 | 5058704016 | 5058706751 | 3 | 9/8/2009 12:00 | 229 | 209 | 2 | 209 | 2 |
| 10 | Phoenix1 | 6023975759 | 6022722659 | 3 | 9/8/2009 12:00 | 41 | 209 | 2 | 209 | 2 |
| 11 | Phoenix1 | 9289781762 | 9289781762 | 6 | 9/8/2009 12:00 | 24 | 209 | 2 | 209 | 2 |
| 12 | Phoenix1 | 9282400298 | 11519282400298 | F | 9/8/2009 12:00 | 19 | 209 | 2 | 209 | 2 |
| 13 | Phoenix1 | 8039723450 | 8039723450 | 3 | 9/8/2009 12:00 | 109 | 209 | 2 | 209 | 2 |
| 14 | Phoenix1 | 4802504629 | 4802504629 | 6 | 9/8/2009 12:00 | 126 | 209 | 2 | 209 | 2 |
| 15 | Phoenix1 | 9282400747 | 11519282400747 | F | 9/8/2009 12:00 | 2 | 209 | 2 | 209 | 2 |
| 16 | Phoenix1 | 9282408129 | 11519282408129 | F | 9/8/2009 12:00 | 10 | 209 | 2 | 209 | 2 |
| 17 | Phoenix1 | 9282438534 | 9282438534 | 6 | 9/8/2009 12:00 | 73 | 209 | 2 | 209 | 2 |
| 18 | Phoenix1 | 6023171411 | 9285873367 | 3 | 9/8/2009 12:00 | 38 | 209 | 2 | 209 | 2 |
| 19 | Phoenix1 | 9285211632 | 11519285211632 | F | 9/8/2009 12:00 | 3 | 209 | 2 | 209 | 2 |
| 20 | Phoenix1 | 6023201588 | 8008961067 | 3 | 9/8/2009 12:00 | 429 | 275 | 4 | 209 | 2 |
| 21 | Phoenix1 | 9285873367 | 9285873367 | 6 | 9/8/2009 12:00 | 30 | 209 | 2 | 209 | 2 |
| 22 | Phoenix1 | 9282408885 | 11519282408885 | F | 9/8/2009 12:01 | 6 | 209 | 2 | 209 | 2 |
| 23 | Phoenix1 | 6027084489 | 6027084485 | 3 | 9/8/2009 12:01 | 8 | 209 | 2 | 209 | 2 |
| 24 | Phoenix1 | 9282430681 | 11519282430681 | F | 9/8/2009 12:01 | 7 | 209 | 2 | 209 | 2 |
| 25 | Phoenix1 | 6022065508 | 19282520631 | 3 | 9/8/2009 12:01 | 16 | 209 | 2 | 209 | 2 |
| 26 | Phoenix1 | 6023975759 | 6029194043 | 3 | 9/8/2009 12:01 | 29 | 209 | 2 | 209 | 2 |
| 27 | Phoenix1 | 9282400607 | 8138264597 | 3 | 9/8/2009 12:01 | 845 | 209 | 2 | 209 | 2 |
| 28 | Phoenix1 | 5058701765 | 5058701765 | 6 | 9/8/2009 12:01 | 32 | 229 | 4 | 209 | 2 |
| 29 | Phoenix1 | 9282400084 | 2401658 | 3 | 9/8/2009 12:01 | 27 | 209 | 2 | 209 | 2 |
| 30 | Phoenix1 | 4807107886 | 9282400563 | 3 | 9/8/2009 12:01 | 70 | 209 | 2 | 209 | 2 |
| 31 | Phoenix1 | 6027084489 | 6027084484 | 3 | 9/8/2009 12:01 | 88 | 209 | 2 | 209 | 2 |
| 32 | Phoenix1 | 4805181814 | 4805181814 | 6 | 9/8/2009 12:01 | 14 | 209 | 2 | 209 | 2 |
| 33 | Phoenix1 | 6023771292 | 6236942203 | 3 | 9/8/2009 12:01 | 232 | 209 | 2 | 209 | 2 |
| 34 | Phoenix1 | 6023991931 | 7737096503 | 3 | 9/8/2009 12:01 | 109 | 209 | 2 | 209 | 2 |
| 35 | Phoenix1 | 6026708400 | 6022351575 | 3 | 9/8/2009 12:01 | 29 | 209 | 2 | 209 | 2 |
| 36 | Phoenix1 | 6236942203 | 6236942203 | 6 | 9/8/2009 12:01 | 226 | 209 | 2 | 209 | 2 |

| | K |
|---|---|
| 1 | **CPN** |
| 2 | 9285354750 |
| 3 | 9282401375 |
| 4 | 6023615249 |
| 5 | 9282400879 |
| 6 | 9289782884 |
| 7 | 6232107374 |
| 8 | 9282400143 |
| 9 | 5058704016 |
| 10 | 6023975759 |
| 11 | 9289704864 |
| 12 | 9282400297 |
| 13 | 8039723450 |
| 14 | 6025011131 |
| 15 | 4792460322 |
| 16 | 9282400904 |
| 17 | 6232073510 |
| 18 | 6023171411 |
| 19 | 9285327686 |
| 20 | 6023201588 |
| 21 | 6023171411 |
| 22 | 9283589834 |
| 23 | 6027084489 |
| 24 | 9282421114 |
| 25 | 6022065508 |
| 26 | 6023975759 |
| 27 | 9282400607 |
| 28 | 4084997446 |
| 29 | 9282400084 |
| 30 | 4807107886 |
| 31 | 6027084489 |
| 32 | 4805803920 |
| 33 | 6023771292 |
| 34 | 6023991931 |
| 35 | 6026708400 |
| 36 | 6023771292 |